**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF IOWA**
**CENTRAL DIVISION**

MICHAEL RINEHART,     \*    CIVIL NO. 4-18-cv-262
            \*
    Plaintiff,     \*
  v.         \*
            \*    **REPORT AND**
KRIS WEITZELL, JEREMY LARSON, \*    **RECOMMENDATION**
JOHN MAYS, DOUG BOLTON and  \*
NEWTON CORRECTIONAL FACILITY \*
            \*
    Defendants.    \*

## I.  INTRODUCTION

This case was brought by Michael Rinehart (Rinehart), previously an inmate at the Newton Correctional Facility (NCF). He alleges he suffers from diverticulitis and asserts various claims under the Americans with Disabilities Act (ADA). He contends, while incarcerated at the NCF, prison officials violated the ADA by denying to him privileges he had earned, because of his diverticulitis. He also claims prison officials retaliated against him in violation of the ADA, when he filed ADA grievances. In addition, he asserts prison officials were deliberately indifferent to his diagnosed medical needs. After holding an evidentiary hearing, this Magistrate Judge recommends the relief Rinehart requests be denied.

## II.  PROCEDURAL HISTORY

In August 2018, Plaintiff Michael Rinehart (Rinehart) filed a pro se complaint against Kris Weitzell, Jeremy Larson, John Mays, Doug Bolton and Newton Correctional Facility (Defendants). Dkt. 1. On September 6, 2018, an initial review order was entered reviewing Rinehart's complaint and finding Rinehart had failed to sufficiently state a claim for relief. Dkt. 7. Accordingly, his complaint was dismissed. *Id.*

Rinehart subsequently filed a notice of appeal on October 22, 2018. Dkt. 12. The matter was submitted to the Eighth Circuit Court of Appeals which filed its opinion on July 2, 2020, reversing the dismissal of Rinehart's complaint. *See Rinehart v. Weitzell,* 964 F.3d 684  (8th Cir. 2020); Dkt. 18-1. The Eighth Circuit determined Rinehart had sufficiently alleged: (1) he was an individual with a disability, as required to state an ADA disability discrimination claim; (2) he had been discriminated against on the basis of disability, as required to state an ADA disability discrimination claim; and (3) Defendants retaliated against him after he filed grievances regarding discrimination, as required to state an ADA retaliation claim. *Id.*

After the Eighth Circuit mandate issued, counsel was appointed for Rinehart and he was allowed time to amend his complaint. Dkt. 20. An "Amended Petition" was filed January 10, 2021, with the assistance of counsel. Dkt. 27. Therein, Rinehart alleges while incarcerated at the NCF, the prison and its officials violated the ADA by denying him access to the privileges for which he was otherwise eligible, because of his diverticulitis. Dkt. 27 p. 7. He further alleges the prison and its officials retaliated against him for filing ADA grievances by revoking his medical classification. *Id.* p. 8. Finally, he alleges the prison, and its officials were deliberately indifferent to his diagnosed medical needs. *Id.*

On January 25, 2021, an answer to the amended petition was filed by Defendants, denying the material allegations therein. Dkt. 28. On July 14, 2021, the case was referred to this Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) by Chief Judge John A. Jarvey. Dkt. 32.

By agreement of the parties, an evidentiary hearing was held on October 15, 2021 by video conference. Dkt. 42. Rinehart and his attorney, Tiffany Kragnes, appeared personally by video. *Id.* Defendants Kris Weitzell and John Mays and Defendants' attorney, William Hill, Iowa Assistant Attorney General, also appeared personally by video. *Id.* Testimony was received from Rinehart,

his wife, Juli Ann Rinehart, Kris Weitzell and John Mays, all by video. *Id.* Rinehart's Exhibits 1

through 6 were received without objection and filed under seal. *Id.* Defendants' Exhibits A

through C were also received without objection and filed under seal. *Id.*

The parties were permitted to file post-hearing briefs by December 1, 2021. Dkt. 46. In

particular, this Magistrate Judge requested Rinehart to address the specific relief he is seeking.

Extensions were granted, and Defendants timely filed their brief on December 2, 2021. Dkt. 49.

On December 3, 2021, Rinehart timely filed his brief. Dkt. 50. On December 10, 2021, Rinehart

filed his response brief. Dkt. 51.

In his post-trial briefing, Rinehart requests he be granted the following:

A. While Mr. Rinehart currently does not reside at Newton Correctional
Facility, the Court should order that if Mr. Rinehart is placed at Newton
Correctional Facility, that he receive Level 6 privileges he had obtained and be
placed in a living unit with "wet" cells. Further, the Court should order that
regardless of the facility Mr. Rinehart may reside, his disability is verified, and all
rights and privileges shall apply to him, unless and until a medical evaluation
conducted by a licensed doctor indicates Rinehart no longer has a disability.

B. Further, Mr. Rinehart requests the Court order and sanction the
Defendants to abide by federal and state laws, specifically the American with
Disabilities Act (ADA). No inmate should suffer the years of restrictions, loss of
privileges, and retaliation due to a disability. Mr. Rinehart would request a special
master be ordered to review any and all disability claims at NCF and ensure
Defendants are not ignoring federal law and inmates with disabilities. The Court
should further order Defendants, specifically NCF, to establish policies, processes
and procedures, with accountability built in and outside of the facility to ensure
NCF's compliance. These policies, processes and procedures must include
provisions for inmates with disabilities to have equal access to recreational,
educational, vocational or medical opportunities being offered while diagnosed
with a qualifying medical condition. Once a medically qualifying diagnosis is made
whether inside the institution or outside, a duty is now established and must be
followed throughout their stay, preferably not only at NCF but also any institution
the inmate may reside within the Department of Corrections.

C. Further, Mr. Rinehart requests compensatory damages of $25,000 per
year for three years for lost privileges, include time and visitation with his wife and
any other family members.

D. Further Mr. Rinehart requests punitive damages considering Defendants complete disregard for his acquired privilege status and his disability, punishing Plaintiff for his disability, of which he had no control over and was medically diagnosed and for their retaliation against Rinehart for attempting to file and then filing an ADA complaint.

E. The Court should grant Plaintiff's attorney fees and costs, be charged with the costs of this action and for any other relief the Court deems appropriate.

Dkt. 50 pp. 13-14, Dkt. 51 pp. 4-5.

The Court considers the matter to be fully submitted. This Magistrate Judge has carefully considered the record evidence, including the exhibits admitted, the briefs filed by both parties, the arguments and statements of counsel and submits the following report. As set forth below, based on the evidence presented and applicable law, it is recommended the relief requested by Rinehart be denied.

### III.  EVIDENTIARY RECORD

In their Proposed Final Pretrial Conference Form [Dkt. 38], adopted by the Court in its Order re Evidentiary Hearing [Dkt. 41], the parties listed certain matters they agreed were true and undisputed. In addition, the parties listed certain parts of the Eighth Circuit's ruling in this case, indicating "[t]he facts as recited on appeal are substantially accurate." Dkt. 41, § I(F). This Court notes the matters the parties set forth from the Eighth Circuit's ruling derive from the initial complaint and pleadings Rinehart filed in this proceeding. Those were the filings subject to the initial review order entered herein and reviewed by the Eighth Circuit.

As it relates to witness testimony, this Magistrate Judge observes that most of the testimony presented from all witnesses was credible and consistent. However, it is also noted Rinehart suffers from a medical condition impacting his memory to the extent he has no memory of his time at the NCF whatsoever. Further, by her own admission, much of the testimony presented by Mrs. Rinehart does not come from her own firsthand knowledge, but from other individuals. Those

matters impact the consideration and weight to be given to such testimony and is noted below.

## A. Matters Set Forth by the Parties in Order re Evidentiary Hearing

Rinehart is currently incarcerated at the Iowa Medical & Classification Center (IMCC) in Coralville, Iowa. Dkt. 41, § I(A). He was previously incarcerated at the NCF in Newton, Iowa from July 28, 2001 until April 6, 2020, when he was transferred to the IMCC. *Id.* § I(B). The incidents underlying this action all occurred while Rinehart was at the NCF. *Id.* § I(C). After Rinehart brought his action, the case was dismissed on initial review. Rinehart appealed the decision, and the order was reversed. *See Rinehart v. Weitzell*, 964 F.3d 684 (8th Cir. 2020). *Id.* § I(E).

As noted above, the parties refer to the following portion of the Eighth Circuit *Rinehart* ruling recited on appeal as "substantially accurate":

> Rinehart is currently serving a prison sentence at the Newton Correctional Facility (the prison) in Newton, Iowa. He has a diagnosis of diverticulitis, a chronic colon condition that causes diarrhea and constipation. He is treated for the condition by medical staff at the prison, but he still suffers flare-ups of the disease that can be severe and make immediate access to a toilet a medical necessity. For this reason, Rinehart resides in one of the prison's units with in-cell toilets.
>
> The prison has a multi-level inmate privilege system through which good behavior is rewarded with access to certain privileges. Since 2001, Rinehart had level-five status, the prison's then-highest privilege level. In 2016, all prisoners with level-five status were required to move to Unit E. Because Unit E does not provide a toilet in each cell, Rinehart was unable to move units. Rinehart requested a medical exception, hoping he could stay in his current unit, which had in-cell toilets, while maintaining his access to level-five privileges. A prison official denied his request and Rinehart lost access to his level-five privileges. The prison considered the denial of Rinehart's requests a "classification decision." Pursuant to the prison's own policies, "classification decisions" are not reviewable through the prison's internal grievance procedure.
>
> On April 18, 2016, he filed an ADA grievance related to his loss of level-five privileges.
>
> In late 2017, the prison added an additional tier of privileges, level six. All prisoners enjoying level-six privileges were also required to live in Unit E. The prison offered

Rinehart level-six privileges, but only if he agreed to live in Unit E, which still lacked in-cell toilets. Once again, Rinehart requested a medical exception that would allow him to stay in his current unit, with access to an in-cell toilet, and still enjoy the level-six privileges. His request for an exception was denied. Instead, prison officials John Mays and Jeremy Larson offered Rinehart a cell in Unit E that was near public toilets. Given the realities of his condition during a flare up, Rinehart rejected the offer.

In January 2018, a doctor at the prison issued a notice that Rinehart needed to be housed in a "room with a toilet available due to a medical issue." In early February 2018, Rinehart contacted Kris Weitzell, the prison warden, to seek assistance in securing a medical exception allowing him to access his level-six privileges. Weitzell responded: "We will discuss." No further discussion occurred. Later in February, Rinehart's wife contacted Doug Bolton, of the Iowa Department of Corrections, to discuss Rinehart's requests. Bolton responded by saying that Rinehart qualified for level-six privileges and that the prison was going to remove Rinehart's medical restriction so that he would no longer be classified as having diverticulitis. This reclassification of Rinehart's medical needs occurred without a medical reexamination or diagnosis.

*Rinehart v. Weitzell*, 964 F.3d 684 (8th Cir. 2020).

Dkt. 41 § I(F).

**B.  Testimony of Michael Rinehart**

Rinehart presented testimony on October 15, 2021 in response to questions from his attorney and Defendants' attorney. Rinehart appeared by video conference from the IMCC, present in the same location with his attorney.

Rinehart currently resides at IMCC in Iowa. Tr. p. 8. He is not fond of residing at IMCC. *Id.* p. 20. He does not believe they provide any mental health care and "they medicate the hell out of me" but said he does not see the doctors regularly. *Id.* p. 20. Rinehart indicated a doctor came to see him recently, but he had not seen this doctor in a long time and did not remember the doctor. *Id.*

He has been married to Juli Rinehart for eleven years. *Id.* p. 11. Mrs. Rinehart lives in Knoxville, Iowa. *Id.* p. 22. Although not a typical marriage, he indicated they spend time together

in the visiting room for forty-five minutes to an hour once a week in addition to an in-person visit. *Id.* p. 11. There are limitations for the visiting room, and Rinehart believes COVID protocols are a major reason. *Id*. When not visiting in-person, he and Mrs. Rinehart communicate everyday by e-mail, and he uses a tablet for this purpose. *Id*. p. 12.  He is allowed phone calls as well. *Id*. Their conversations cover a wide range of topics, including things affecting their lives and this case. *Id.* p. 13. Rinehart said he had no idea what the case was about until the last couple days. *Id.*

Rinehart, through questioning and discussion with his attorney, indicated he suffered a medical event unrelated to his diverticulitis, which affects his memory and ability to recall information. *Id.* pp. 9-10. He has memory issues but can remember some things. *Id.* pp. 9-13, 17-20. Although he is aware he was housed at the NCF for a significant period of time, he stated he has no recollection of being at the NCF. *Id.* p. 9. He knows he was previously stationed at the Fort Madison State Penitentiary in Fort Madison, Iowa as well as the NCF; however, he does not remember being at the NCF, what it looks like, having visitors, if he had roommates, or where the bathrooms were. *Id.* pp. 9-10, 12, 16-18. Rather, people tell him his memories from Fort Madison are actually events from the NCF. *Id.* p. 9. He was not sure if the IMCC or the NCF is closer to Mrs. Reinhart. *Id.* p. 22.

While he has been incarcerated, he has dealt with a medical ailment known as diverticulitis which is a colon condition resulting in unexpected diarrhea or constipation. *Id.* pp. 13, 15. He testified most of the time, nothing affects him from the diverticulitis, "but there are occasions, and they're not infrequent, where I have flare-ups of the colon condition, and during those flare-ups, I get really bad cases of diarrhea and I need to have access to a toilet, and sometimes they come on just immediately, and I mean, I have to have access to a toilet. I can't be messing around, you know. I don't have time to go find one." *Id.* p. 13.

The time between diverticulitis episodes can be days or more than a week. *Id.* p. 14. Although he has never had a problem getting to a bathroom, he is never very far from a bathroom which limits him to a very small area and affects his daily activities. *Id.* pp. 13-14. His current cell does contain a bathroom. *Id.* p. 14. Rinehart testified in his current cell, if the bathroom is occupied, he has had to use other bathrooms. *Id.* p. 17. However, if he were moved to a different cell, he is worried about being in a cell without a bathroom. *Id.* p. 22. This concern stems from concerns of communal bathroom stalls potentially being occupied and privacy concerns when he has diarrhea. *Id.* p. 22. Rinehart indicated he is not confined to his cell due to the bathroom issue. *Id.* pp. 18-19. He leaves the area of his cell when he speaks to his wife on the phone and sometimes for meals. *Id.*

### C. Testimony of Juli Ann Rinehart

Juli Rinehart testified by video from her home in Knoxville, Iowa. She is retired and spends time helping Rinehart with this case, which she has done over the past six years. *Id.* pp. 34-36. She obtained power of attorney for Rinehart to assist with the ADA complaint, including filing the paperwork and having people served. *Id.* pp. 33-35, 47. She contended, because of Rinehart's inability to get the form for his ADA complaint, she helped him obtain the form to file the complaint. *Id.* p. 34.

Mrs. Rinehart claims shortly after the ADA complaint was filed, Rinehart's doctor's note for a toilet in his cell was rescinded without a review or any change in his medical condition regarding his diverticulitis. *Id.* p. 37. Due to the problems she has seen with the ADA complaint, she keeps a diary documenting things she sees as "going wrong." *Id.* pp. 35. To keep track of everything involved with the ADA complaint, she has a room in her house with files dedicated to it. *Id.* p. 35

When she was working, she would help Rinehart with his case when she was at lunch or at night. *Id*. p. 36. She also tried to work with prison officials to resolve the ADA complaint and wrote an e-mail to Doug Bolton regarding Rinehart's privilege level. *Id*. p. 36. She did not remember receiving a response to her e-mail. *Id*. p. 37. Although not named as a plaintiff, she refers to Rinehart's ADA complaint as "our case". *Id*. pp. 43, 47.

She has been married for eleven years to Rinehart. *Id*. pp. 25. He supports her while he is in prison by sending her $20.00 each month. *Id*. pp. 33-34. She explained their relationship is different as they are both older. *Id*. p. 25. They have agreed they would not do for each other what each person could do for himself/herself. *Id*. pp. 33-34. She was clear that communication daily is key to keeping their relationship strong, and they try to arrange schedules or put things aside to make this a priority. *Id*. pp. 25-26, 30. They communicate by visits, phone calls, e-mails, and letters throughout the week to discuss what they are going through, to have debates, and to discuss this case. *Id*.

This method of communication usually worked, but the couple did have problems in 2014 when Rinehart was at the NCF. *Id*. pp. 27-28. Mrs. Rinehart testified staff would cancel their visit if he had to use the bathroom because it required him to leave the visiting area. *Id*. pp. 27-28. The situation was further complicated if a visit had started and Rinehart needed to use the bathroom, as Rinehart could not use the bathroom in the visiting area for bowel movement. *Id*. p. 28. Instead, he would have to wait to use a bathroom until the visit was completed. *Id*. This caused Rinehart to have pain in this lower abdomen, due to his diverticulitis. *Id*. p. 28.

Mrs. Rinehart understood the diverticulitis, which caused the bowel movements, was diagnosed at the University of Iowa Hospitals before she met Rinehart. *Id*. p. 28. She does not know how this medical ailment affects him outside of what Rinehart has told her. *Id*. p. 29. To the

best of her knowledge, he needs to have a toilet close by because of the "explosive" diarrhea, although he has never soiled himself. *Id*. pp. 28-29, 41-42. The diverticulitis affects him emotionally and affects his day-to-day activities. *Id*. pp. 45-46.

Mrs. Rinehart acknowledged at the hearing her knowledge of what is happening to Rinehart inside the prison comes from him. *Id*. pp. 38-39, 42. She admitted she has never been inside Rinehart's living unit or personally observed him in the prison other than in the visiting room. *Id*. pp. 38-39. Her understanding is the medical ailment affected Rinehart's privilege level at the prison. *Id*. pp. 29-33, 41, 44. She believes Rinehart did not move to a new privilege level area, Unit E, because of the lack of a bathroom in the cell. *Id*. p. 41.

Mrs. Rinehart claims, without moving to the new unit, many of the privileges Rinehart previously enjoyed were cut completely or curtailed. *Id*. pp. 29-33, 41, 44. Her  understanding is his yard time was lowered and because of his work schedule, he could not go at all because there was no time. *Id*. p. 32. This affected his ability to get exercise and have social time. *Id*. She also claimed his ability to get special event food was eliminated. *Id*. pp. 32-33. Visiting time and frequency was cut from three visits to two, for two hours at a time. *Id*. p. 30. Up to this point, the couple had had 1700 visits. *Id*. p. 30. Mrs. Rinehart expressed she was afraid the visiting restrictions would cause them to separate, and this situation was stressful for her. *Id*. p. 31.She was also worried if she filed a report about this, it could be used against Rinehart. *Id*. She was afraid of him getting a minor report and then the minor reports turning into a major report. *Id*.

She holds her own opinions of the staff at the NCF regarding their treatment of Rinehart, some positive and some critical. *Id*. pp. 39-40. For example, after the ADA complaint was filed, she did not agree with how Rinehart was being treated, and she recorded an officer in the foyer of the visiting room. *Id*. p. 40-41. She claims the officer was speaking about giving Rinehart a report

for showing up to a visit before he was called. *Id*. p. 43.

### D. Testimony of Kris Weitzell

Kris Weitzell testified by video from the NCF. She is now retired but previously served as warden at the NCF from April 2016 to July 22, 2021. *Id.* pp. 50-51. Ms. Weitzell worked for the Department of Corrections for approximately 38 years at various facilities and in various positions, including as a correctional officer, lieutenant, captain, security manager, security director, deputy warden, assistant deputy director, acting deputy warden, acting warden, superintendent, and warden. *Id.*

The NCF has changed over the years, and is currently the sex offender treatment program facility for the State of Iowa. *Id.* p. 51. In the past, the NCF has been the substance abuse facility. *Id*. Due to the change in focus of the prison, many offenders have been moved into and out of the NCF. *Id*. At any one time, approximately 950 offenders and 250 staff are at the NCF. *Id.* p. 52.

The NCF is a medium security prison comprised of five living units, Units A through E. *Id.* During Ms. Weitzell's time at the NCF, Unit A housed people under disciplinary detention and protective custody. *Id.* pp. 52-53. Unit B was comprised of those in administrative segregation, along with certain other statuses. *Id.* p. 53. Unit B is a two-wing unit with a center officer station. *Id.* Units C and D are identical in design with an open center officer post and two wings. *Id.* Unit D cells have an electronically controlled steel door which is opened by staff when requested. *Id.* p. 64. All cells in Units A through D are considered "wet cells" in that they each contain a sink and toilet in the cell. *Id*. p. 54.

Unit E was designed for the highest privilege level residents at the NCF to encourage positive behavior. *Id.* pp. 54, 65. Unit E is similar in design to Units C and D, but not identical. *Id.* p. 53. Unit E has wooden doors, rather than steel doors, and the location of restrooms is in a

common area, which include showers. *Id.* pp. 53, 63-65. The cells in Unit E are referred to as "dry cells" as they do not have bathrooms within the cell as the cells in other units do. *Id.* pp. 53, 63, 64, 66. Additionally, the staff have a master key to the cells, but Ms. Weitzell was clear the cell doors are not locked like traditional prison doors, and each resident has a key and can lock their cell door if they wish. *Id.* pp. 53, 61-63.

A privilege level classification system applies to the residents at the NCF. Units A and B have a different structure that does not fit into the level system. *Id.* p. 55. Residents on Level 4 reside in Unit C; Level 5 residents reside in Unit D and Level 6 residents reside in Unit E. *Id.* Residents in Level 6 have additional privileges, including longer visits if the visiting room was not full, up to an hour longer yard time in the evening, and an ice cream machine. *Id.* pp. 55-56. To qualify for Level 6, a resident must have a full-time job, no major reports, be in required treatment, and have positive behavior. *Id.* pp. 56, 65.

The units and privilege levels were maintained to keep residents in a particular unit all on the same privilege level. *Id.* pp. 55, 65-66, 70-75. Exceptions were rarely made because it was taxing on the staff to oversee and a potential security issue. *Id.* Ms. Weitzell noted it was extremely difficult for staff to monitor different levels within living units. *Id.* p. 71. Further, a real security issue arises when mixing privilege levels, which can result in fights, "strong-arming" or other serious issues. *Id.* The only exception Ms. Weitzell recalled was for offenders elected as counsel representatives and for offenders selected to be mentors. *Id.* p. 69. If those individuals held a higher privilege level than the unit they were assigned to, they would not receive the higher privilege level benefits. *Id.* p. 68. A resident could decline those positions if the person wanted to keep a higher level of privilege rather than move to a unit with a lower privilege lever. *Id.* p. 70.

Ms. Weitzell remembers receiving kiosk messages from Rinehart and saying hello to him

in the yard but does not remember reviewing his case or Rinehart having any disciplinary issues. *Id.* pp. 58, 65-67. Besides knowing about the diverticulitis, Ms. Weitzell did not know anything about his physical or mental health while he was at the NCF. *Id.* p. 59. Aside from Rinehart, she could not remember any other residents who had the issue of needing a bathroom in a cell. *Id.* p. 60. She did recall receiving a kiosk message from him about needing a toilet in his cell, responding that she would review his message. *Id.*

Ms. Weitzell testified she had a conversation with Dr. Filippelli, the prison doctor, and the unit staff, and determined Rinehart could be put next to a bathroom in Unit E when he was at the highest privilege level. *Id.* pp. 60-61, 65-67. However, Rinehart did not accept this offer and Ms. Weitzell was not aware why he declined placement in Unit E. *Id.* p. 68. Furthermore, she was not aware Dr. Filippelli had issued a limited activity notice indicating Rinehart needed a room with a toilet available due to a medical issue. *Id.* p. 67. She acknowledged a change to a limited activity notice is generally reviewed by the doctor prior to removal. *Id.* pp. 67-68. However, she was clear in her testimony she knew of no adverse action taken regarding his treatment. *Id.* p. 62. In addition, Ms. Weitzell stated the denial of Rinehart's Level 6 privileges had nothing to do with a disability. *Id.*

Regarding the other individual named parties in this case, Ms. Weitzell indicated her knowledge is limited. *Id.* pp. 61-62. She stated Jeremy Larson was a deputy warden at the NCF, but she does not remember his involvement in this case. *Id.* Her knowledge of Doug Bolton's involvement in these matters comes only from the emails entered as evidence. *Id.* p. 62.

### D.  Testimony of John Mays

John Mays testified by video from the NCF. He is currently employed as a treatment services director/unit manager at the NCF. *Id.* p. 75. He has been with the Department of

Corrections since 1999 as a correctional officer, lieutenant/assistant unit manager, counselor, and a treatment services director/unit manager. *Id.* pp. 75-76. He described his current position as an extension of the warden's office, but he manages units and is more hands on with the residents. *Id.* p. 76. His duties include managing residents and the staff of the unit, day to day operations, resident movement and assisting with classification for intervention assignment. *Id.*

Mr. Mays has been involved with Units C, D, and E as well as the correctional release center. *Id.* In 2016, he worked with Units D and E, and knew Rinehart. *Id.* p. 77. He remembered Rinehart being a model inmate, no trouble, and the one disciplinary report Mr. Mays could remember was reduced or dismissed. *Id.* pp. 81-83, 86, 95. He believed he had a good rapport with Rinehart because they would have conversations and he answered questions for him. *Id.* p. 77. Mr. Mays testified he recalled things about Rinehart and this case from his written notes. *Id.* p. 78. For example, Rinehart was part of the Braille work program, which required skilled and dedicated workers due to the training and continuing education required. *Id.* p. 95. These were coveted jobs given to specific residents. *Id.* The Braille program moved to a different prison facility, but Rinehart chose to stay at Newton because Newton was closer to his wife. *Id.*

Mr. Mays recalled in 2016 while Rinehart was a resident in Unit C, a decision was made to move the highest privilege level to Unit E. *Id.* p. 79. His recollection is Rinehart did not want to move and, therefore, received a level reduction to Level 4. *Id.* Rinehart appealed the decision to the warden but had told Mr. Mays he did not want to make the change to Unit E because of his age, the diverticulitis, and issues with the staff. *Id.* pp. 79-80. Later, Rinehart had advanced to Level 5 and was housed in Unit D. *Id.* p. 80. In 2017 or 2018, privilege Level 5 became Level 6. *Id.* Although an offer was made to place him in a cell in Unit E adjacent to the communal bathroom, which was approximately 20 feet from the cell, Rinehart did not want to move due to the staff in

Unit E and the dry cell status in this unit. *Id.* pp. 80, 91-93, 96.

Mr. Mays confirmed the warden tried not to mix privileges within each unit due to different recreational times, simplifying work of the staff and due to staff shortages. *Id.* p. 82-83. A resident would not receive all the benefits of a privilege level if the person was not in the designated unit, but some privileges like extra visitation or late television time could happen. *Id.* pp. 99-103. Mr. Mays confirmed mixing of the privilege levels on the same unit did happen when Rinehart was at Newton, such as with the elected members of the council or when the privilege levels changed. *Id.* pp. 97.

Mr. Mays testified Unit E has wooden doors and each resident has a key and access to the communal restrooms, so the only door locked by staff, such as in a lockdown, is the front door. *Id.* pp. 80, 87-89. Although not private, the communal restrooms have a greater quantity of available toilets than a wet cell. *Id.* p. 87. This is important because if a resident is housed on Unit D and needed to use the bathroom in his cell, if the cell door was locked, a staff member would need to manually open the cell door which could delay the time to get to the bathroom *Id.* pp. 86, 88-89. The inability to use an in-cell bathroom could also occur if a resident was in a different housing unit, in a treatment class, or if his cell mate was using the in-cell bathroom *Id.* pp. 86-87, 89-90.

Mr. May believed Rinehart was put on a Unit E waiting list in 2019 or 2020 but, because of his diverticulitis, the placement would be reviewed before Rinehart would be moved. *Id.* pp. 83-84, 97-98.  However, prior to getting off the waiting list, Rinehart was transferred to the IMCC after he had a health issue. *Id.* pp. 84-85. Currently, Mr. Mays indicated there are multiple residents dealing with diverticulitis living on Unit E. *Id.* p. 90. He also indicated individuals with the type of health conditions Rinehart has typically remain housed at the IMCC as it is closer to hospital care. *Id.* p. 86.

Mr. Mays confirmed he did not know about Rinehart's ADA claim until a couple of months prior to the hearing. *Id.* p. 82. Therefore, he was clear he had not treated Rinehart differently because of the ADA claim. *Id.* Mr. Mays was transparent in that he realized Rinehart was upset about things changing and disrupting his world as a lifetime resident, which is why he and the staff tried to make Rinehart comfortable. *Id.* He was firm that he and the staff tried to accommodate Rinehart to make him comfortable because he was the kind of resident staff wished all of the residents could be. *Id.*

### E.  Exhibits Admitted During the Evidentiary Hearing

Plaintiff offered six exhibits. Dkt. 43. Plaintiff's Exhibit 1 is an Affidavit of Robert Winfrey from January 9, 2015. He indicates he was with Rinehart when Rinehart attempted to obtain ADA complaint forms. Mr. Winfrey's affidavit sets forth the following:

> Early in the month of November myself Robert Steven Winfrey and inmate Mr. Michael Rinehart #1014410, had gone to the institution Law Library, where Mr. Rinehart ask to get some Title II of the Americans with Dis-abilities Forms, but was told by the inmate Librarian that he would have to receive them From Mr. Brian PFeiFer, who is running the Library. Mr. Rinehart did did (sic) so but was told by Mr. Brian PFeiFer, that he wanted to know what he wanted/needed them For. All Along I Robert Steven Winfrey, was standing Right there with Mr. Rinehart would not tell him he Mr. Brian PFeiFer, what he wanted the Forms For he did not give them to Mr. Rinehart.

Ex. 1.

Plaintiff's Exhibit 2 is Rinehart's eight-page pro se ADA complaint form signed April 18, 2016. Plaintiff's Exhibit 3 is an email from Juli Rinehart to Doug Bolton dated February 20, 2018, which states:

> Doug,
> I have a concern about my husband's current level of privilege being held back by the warden at NCF. He's appealed to the  unit manager, and the warden, so one last step in the effort to  correct the  situation  is to see what you can do to help.
> It has been approximately ten years since Iowa City diagnosed his condition of

diverticulitis, it's permanent, and the flare-ups can be severe at times. Severe enough to have required medical intervention on occasion, and to prompt the doctor to restrict him to a cell with a toilet.  Michael has always received the highest level of privilege for good behavior since he was institutionalized in 1978. It should be a no brainer, but this warden seems determined to disallow his medical exception to allow him to remain in a cell as a level six. He was at the highest level possible when this warden added a higher level and took away privileges from all who had the highest level that would not move to E house. The current exceptions are those who are mentors and those who are on the inmate counsel who live in other units, (One must consider why the majority of prisoners who already exhibit good behavior refuse to move to unit E to receive the new level of benefits they once had and more benefits that were added?) Her words concerning Michael and his case were, "If he can go to the library, he can go to E-house," which shows a total lack of understanding of the condition. Why would she not just allow the exception? There is no question that he has the condition, no question that it qualifies under the ADA as a disability (we've already prevailed in an ADA complaint concerning the use of the inmate restroom in the VR and have on record the minor report fabricated in retaliation for it), and the doctor restricted him to a cell with a toilet. The position Warden Weitzell has taken is completely untenable. It's one of those, "I said so and that's it!" situations. Just thought I would let you know and see what you can do before we have to go back to the ADA or a federal court to get this put right.
Best regards,
Juli Rinehart

Ex. 3.

Plaintiff's Exhibit 4 is an email from Doug Bolton to Juli Rinehart dated February 22, 2018.

Mr. Bolton states:

Juli,

According to Deputy Warden Larson and Dr. Filippelli, Michael would most likely meet the criteria for level 6 as well as the LAN will be lifted by the medical doctor. Michael, has chosen to stay in Unit D, therefore, it has been his decision to stay in that unit. If he wishes otherwise, he needs to pursue that option and if he chooses to move to Unit E they can place him in a room close to the bathroom.

Please feel free to contact facility in the future. Thanks!

Ex. 4.

Plaintiff's Exhibit 5 is a Department of Corrections Health Services Limited Activity

Notice for Rinehart by Dr. Frank Filippelli dated January 29, 2018. Under the section "Housing

Status" a box is checked next to "other" and states "room with a toilet available due to a medical issue", noting an expiration date of April 26, 2018. Ex. 5. Plaintiff's Exhibit 6 consists of seven-pages of Rinehart's medical records from January 2018.[1] Of note in these records is a visit between Rinehart and Dr. Filippelli on January 29, 2018. Ex. 6 p. 6. This record for this visit notes "Pt requesting to have a cell with a toile (sic) in it due to his diverticulosis" and notes a diagnosis of diverticulosis of intestine. *Id.* A Department of Corrections Health Services "Noted Doctor Orders" form lists orders given by Dr. Filippelli to include "LAN: Housing Limitations: Other: room with a toilet available due to a medical issue" with an expiration date April 29, 2018. *Id.* p. 7.

Defendants offered three exhibits. Dkt. 43. Defendant's Exhibit A is Rinehart's Offender Movement Summary. This document is a summary of the Iowa prison locations Rinehart has been in from 1978 to 2020. Defendant's Exhibit B is NCF Policy IS-CL-01, effective April 2019. This is an eighteen-page document describing the transition incentive program for the State of Iowa Department of Corrections. Defendant's Exhibit C is NCF Policy IS-CL-01, effective December 2015. This is a ten-page document of a previous version of the transition incentive program for the State of Iowa Department of Corrections.

## IV.  JUDICIAL REVIEW

 Rinehart alleges violations of Title II of the ADA asserting he was denied access to privileges by reason of his diverticulitis. He also alleges violations of Title V of the ADA contending he was retaliated against for filing ADA grievances. His amended petition asserts an additional claim that Defendants were deliberately indifferent to his serious medical needs. He

---

[1] The exhibit list filed herein [Dkt. 43] identifies Plaintiff's Exhibit 6 as Rinehart's medical records from January 2018 to March 1, 2018. However, the medical records presented are only from January 2018.

requests numerous forms of relief, including various requests for declaratory and injunctive relief, compensatory damages, punitive damages, attorneys' fees, and court costs. The Eighth Circuit ruling in this case sets the parameters of the analysis and the elements Rinehart must establish to prevail on his claims.

### A. ADA Title II Violation - Discrimination

Rinehart contends he is a qualified individual with a disability, as his diverticulitis substantially limits one or more major life activities, namely digestive functions. Dkt. 50 p. 7-9. When active, his condition requires him to seek a bathroom on an emergent basis. *Id*. p. 8. The condition was so chronic a limited activity notice was prescribed requiring Rinehart to be placed in a cell with a toilet. *Id.* He asserts the denial to him of benefits of the NCF's privilege system was by reason of his disability. *Id*. pp. 9-10. Rinehart argues the only reason he lost his privileges is due to his disability as the attempted accommodation was pure illegal coercion. *Id*. p. 10. His disability dictated his choice, which resulted in loss of privileges and benefits. *Id*.

Defendants argue Rinehart's diagnosis of diverticulitis does not establish he is a qualified individual with a disability. Dkt. 49 pp. 7-8. Rinehart does not have a right to a particular cell or unit, he was not denied a toilet, nor was he housed in violation of a medical restriction or denied medical treatment. *Id.* pp. 6-7. Defendants further contend Rinehart was not excluded from participation in or denied the benefits of the NCF's services, programs, or activities or was otherwise subjected to discrimination. *Id.* pp. 9-10. The alleged exclusion or denial of benefits, or other discrimination to Rinehart was not due to his condition. *Id.* pp. 10-11. His demand was not possible in the realm of the operations of a prison. *Id.* p.11.

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services,

programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.  It is well established that "[s]tate prisons fall squarely within the statutory definition of 'public entity.'" *Rinehart*, 964 F.3d at 688. n. 4 (citing *Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998)). Further, the privileges Rinehart complains of in this case fall into the category of benefits protected under Title II of the ADA. *Id.* at 688-89 (citing *Yeskey*, 524 U.S. at 210).

To establish a violation of Title II of the ADA, Rinehart must demonstrate: "(1) that he is a qualified individual with a disability; (2) that he was excluded from participation in or denied the benefits of the [prison's] services, programs, or activities, or was otherwise subjected to discrimination by the [prison]; and (3) that such exclusion, denial of benefits, or other discrimination was by reason of his disability." *Id.* at 688 (citing *Baribeau v. City of Minneapolis*, 596 F.3d 465, 484 (8th Cir. 2010); *Folkerts v. City of Waverly, Iowa*, 707 F.3d 975, 983 (8th Cir. 2013)). *Rinehart* further noted that the "known disability triggers the duty to reasonably accommodate and, if the employer fails to fulfill that duty, we do not care if [the employer] was motivated by disability." *Id.* at 689 (citing *Peebles v. Potter*, 354 F.3d 761, 767 (8th Cir. 2004)).

Under these principles, and based upon the record presented, Rinehart has failed to show he was excluded from privileges by reason of a disability. Whether Rinehart is a qualified individual with a disability for purposes of applying Title II of the ADA is a close question given the limited evidence submitted to the Court. The ADA defines having a disability, in part, as suffering from "a physical or mental impairment that substantially limits one or more major life activities of such individual." *Id.* at 688 (citing 42 U.S.C. § 12102(1)). A "major life activity also includes the operation of a major bodily function," including "digestive" functions. *Id.* (citing 42 U.S.C. § 12102(2)(B)). "[T]he ADA requires that we view an 'impairment that is episodic,' like

Rinehart's as 'a disability if it would substantially limit a major life activity when active.'" *Id.* (citing 42 U.S.C. § 12102(4)(D)).

No party disputes Rinehart's diagnosis of diverticulitis or that, when active, his condition requires him to seek a bathroom on an emergent basis. Rinehart and Mrs. Rinehart both testified credibly as to the pain and discomfort he suffers when his condition is active and the need for him to be close to a bathroom. On the other hand, limited evidence was presented Rinehart's diagnosis *substantially* limited a major life activity when it was active. Rinehart's testimony in this regard was limited by his lack of memory and Mrs. Rinehart's testimony was limited by her lack of firsthand knowledge. It is undisputed, in all his years with his diagnosis and in custody, Rinehart never had an accident or did not make it to the bathroom in time.

Even assuming he has established he is a qualified individual with a disability, Rinehart does not establish he was denied privileges or benefits on account of his disability. This Court finds Ms. Weitzell and Mr. Mays provided credible testimony as to why Rinehart could not be allowed to have the highest level of privileges, while also being housed in a unit with cells with toilets. They both testified as to the administrative burden such an arrangement would place on NCF staff. Mr. Mays explained this in great detail. Tr. pp. 82-83. Ms. Weitzell testified as to the security concerns that would be created, as well. Tr. p. 71. The Eighth Circuit has noted whether a requested accommodation is reasonable or imposes an undue burden on defendants should be considered in light of "the heightened security concerns of a prison." *Randolph v. Rogers*, 170 F.3d 850, 859 (8th Cir. 1999).

Further, Rinehart was provided with a reasonable accommodation – a cell in the unit with the highest privileges next to the bathrooms. This Court finds Mr. Mays' detailed testimony as to why this arrangement would actually provide Rinehart with better and unfettered access to a toilet

when his diverticulitis was active than if he had a toilet in his cell to be very credible. Tr. pp. 86-87, 88-90. Rinehart rejected this accommodation every time it was offered. Just because the accommodation may not have been Rinehart's preferred choice, does not make it unreasonable. An ADA plaintiff is entitled to reasonable accommodations, however, that may not always be the plaintiff's preferred or ideal accommodations. *Griffin v. United Parcel Serv., Inc.*, 661 F.3d 216, 224 (8th Cir. 2011) (employment context); *Huber v. Wal-Mart Stores, Inc.*, 486 F.3d 480, 484 (8th Cir. 2007) (employment context).

In addition, to the extent Rinehart seeks damages from the named defendants in their individual capacities, he does not provide sufficient evidence to demonstrate liability. With respect to Jeremy Larson and Doug Bolton, he provides no evidence as to their involvement. As to Ms. Weitzell and Mr. Mays, as set forth above, neither of them acted in violation of the law. Further, individuals in their personal capacities are not subject to suit under Title II, which provides redress only from public entities. *Baribeau v. City of Minneapolis*, 596 F.3d 465, 484 (8th Cir. 2010) (citing *Alsbrook v. City of Maumelle*, 184 F.3d 999, 1005 n. 8 (8th Cir. 1999) (en banc)). As such, Rinehart may not recover damages from the individually named Defendants.

### B.  ADA Title II Violation - Retaliation

Rinehart contends prison officials retaliated against him in violation of the ADA, when he filed ADA grievances. Dkt. 50 pp. 11-13. The alleged adverse action against him includes interference with his attempts to file an ADA complaint, changing his privileges and housing units, and changing his limited activity notice without an appropriate medical evaluation. *Id*.  Defendants counter Rinehart cannot establish a claim of retaliation stemming from his allegations that his rights under the ADA were violated. Dkt. 49 pp. 11-14. Defendants admit Rinehart did engage in protected activity, but assert no adverse action was taken against him based on his complaints. *Id*.

pp. 11-13. Further, there is no casual connection between any alleged adverse action and the protected activity. *Id*. pp. 13-14.

Title V of the ADA prohibits retaliating "against any individual because such individual has opposed any act or practice made unlawful by [the ADA] or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [the ADA]." *Rinehart*, 964 F.3d at 698 (citing 42 U.S.C. § 12203(a)). To state a claim under this provision, Rinehart must show that (1) he engaged in statutorily protected activity; (2) adverse action was taken against him; and (3) a causal connection exists between the adverse action and protected activity. *Id.* (citing *Stewart v. Indep. Sch. Dist. No*. 196, 481 F.3d 1034, 1043 (8th Cir. 2007)).

This Magistrate Judge determines Rinehart does not meet his burden of proof to show adverse action was taken against him or there exists a causal connection between adverse action and his filing of the ADA complaint. Rinehart claims he was prevented from obtaining ADA complaint forms at the prison library. The only evidence presented on this matter is Rinehart's Exhibit 1, an affidavit from Robert Winfrey, a fellow inmate. This exhibit does not demonstrate adverse action was taken against Rinehart or that there was a causal connection to the filing of his ADA complaint. The exhibit does not set forth any information as to alleged actions taken by the NCF or any individually named defendants. As such, as to this allegation, Rinehart has not shown he suffered adverse action; indeed, Rinehart did file the ADA complaint that is the basis of this proceeding.

Concerning Rinehart's allegation as to changes to his privileges and housing units, the record evidence does not support such a claim. As set forth above, Defendants did not discriminate against Rinehart based upon a disability and attempted to provide him a reasonable

accommodation. As such, Rinehart suffered no adverse action in that manner.

Regarding the assertion his limited activity notice was changed without an appropriate medical evaluation, this Magistrate Judge finds no record evidence of the same. Rinehart presented medical records from January 2018. Those medical records and the limited activity notice itself all indicate the limited activity notice expires April 29, 2018. *See* Ex. 5, Ex. 6, pp. 6-7. The medical records do not indicate the limited activity notice was ever changed, extended or cancelled. Rinehart points to the e-mail from Doug Bolton to Mrs. Rinehart stating "[a]ccording to Deputy Warden Larson and Dr. Filippilli, Michael would most likely meet the criteria for level 6 as well as the LAN [limited activity notice] will be lifted by the medical doctor." Ex. 4. However, no evidence was presented that this occurred. Indeed, Rinehart was never without a toilet in his cell at the NCF.

Instead, this Magistrate Judge finds credible the testimony from Mr. Mays as to his efforts on the part of Rinehart to accommodate him, afford him the privilege level he earned and address his issues with the diverticulitis. Mr. Mays testified he:

> [d]idn't even know there was any claim until this all came to fruition a couple months ago. I didn't know he had filed anything or anything like that. I know he was upset that he wanted things to kind of stay the way they were. I'm sure being a lifer, being housed on LUC [living unit C] as long as he was, working in the braille program, all that change kind of came as an disrupt, you know, change in life for him, and that was very disappointing for him, but I can speak for myself and my staff that we -- accommodations were being made to help him be comfortable because, again, he was the kind of client that we have that we wish they all behaved like him because he was generally pleasant and did what he was expected to do.

Tr. p. 82. Mr. Mays discussed at length the measures he took with Rinehart to discuss these matters and meet Rinehart's needs within the confines of the structure and rules at the NCF and Rinehart's condition with the diverticulitis. Within this context, it is clear to this Magistrate Judge Mr. Bolton's e-mail to Mrs. Rinehart was an assurance to her that staff at the NCF were simply doing

what they could to accommodate Rinehart. All of this shows the lack of a causal connection between any alleged adverse action and Rinehart filing his ADA complaint.

In addition, to the extent Rinehart seeks damages from the named defendants in their individual capacities, he does not provide sufficient evidence to demonstrate liability. With respect to Jeremy Larson and Ms. Weitzell, he provides no evidence as to their involvement. As to Mr. Bolton and Mr. Mays, as set forth above, neither of them acted in violation of the law. As such, Rinehart may not recover damages from the individually named Defendants.

### C.  Deliberate Indifference to Serious Medical Need

The Eighth Amendment to the United States Constitution prohibits cruel and unusual punishment. *Allard v. Baldwin*, 779 F.3d 768, 771 (8th Cir. 2015). That prohibition includes prison officials' deliberate indifference to the medical needs of inmates. *Id*. "An Eighth Amendment claim that prison officials were deliberately indifferent to the medical needs of inmates involves both an objective and a subjective component. The plaintiffs must demonstrate (1) that they suffered objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs." *Id.* (citing *Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997)).

The claim of deliberate indifference to medical needs is set forth in Rinehart's Amended Petition Dkt. 27.  Rinehart mentions in his testimony he does not believe the IMCC provides any mental health care, "they medicate the hell out of me" and he said he does not see the doctors regularly. Tr. p. 20. Beyond this, Rinehart lists as a factual issue whether the lifting of a medical restriction constitutes deliberate indifference to a serious medical need in the Order re Evidentiary Hearing filed herein. Dkt. 41 § IV(A)(5). However, Rinehart does not address any of these issues in his post-trial briefs.

This Magistrate Judge determines Rinehart does not provide evidence sufficient to meet his burden of proof to show he is entitled to relief under a claim of deliberate indifference to serious medical needs by Defendants.

### D.  Requested Relief

Rinehart requests specific, detailed injunctive and declaratory relief. As to the requests for declaratory judgment, Rinehart has not provided sufficient evidence to support the extent of the relief requested or legal authority in support of such request. As to his request for injunctive relief, given that Rinehart has been transferred to the IMCC, no longer resides at the NCF and is likely to stay at the IMCC based on his current medical condition, his claims seeking injunctive relief are moot. When there is no showing of "any real or immediate threat that the plaintiff will be wronged again" injunctive and declaratory relief is unavailable. *Martin v. Sergeant*, 780 F.2d 1334, 1337 (8th Cir. 1985) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983)). Similarly, when a prisoner is no longer subject to the policies that he challenges, there is no live case or controversy. *Martin*, 780 F.2d at 1337.

In addition, much of the relief Rinehart seeks is simply not available to him. He requests punitive damages, yet punitive damages are not available under Title II of the ADA. *Meagley v. City of Little Rock*, 639 F.3d 384, 390 (8th Cir. 2011). As it relates to his claim for compensatory damages against a public entity, Rinehart must show intentional discrimination based on disability. *Meagley v. City of Little Rock*, 639 F.3d 384, 389 (8th Cir. 2011). This requires a showing Defendants were deliberately indifferent to his ADA rights. *Id*. As set forth above, Rinehart also fails to meet this burden.

Given this Magistrate Judge's recommendations set forth above concerning the relief Rinehart seeks as to the individual defendants, this Magistrate Judge does not reach Defendants'

contention Rinehart cannot recover damages based on qualified immunity.

## V.   RECOMMENDATION

IT IS RESPECTFULLY RECOMMENDED, the relief requested by Rinehart in his Amended Petition (Dkt. 27) be denied.

IT IS ORDERED, the parties have until February 28, 2022 to file written objections to the Report and Recommendation, pursuant to pursuant to 20 U.S.C. § 636(b)(1), Fed. R. Civ. P. 72(b)(2), and L.R. 72A.

Dated February 14, 2022.

_____
STEPHEN B. JACKSON, JR.
UNITED STATES MAGISTRATE JUDGE